BEFORE THE ARBITRATOR

| | |
|---|---|
| In the Matter of the Arbitration<br>of a Dispute Between<br><br>INTERNATIONAL ASSOCIATION OF MACHINISTS<br>AND AEROSPACE WORKERS, AFL-CIO,<br>DISTRICT 8<br><br>     and<br><br>MONDELEZ GLOBAL, LLC | FMCS Case No. 150730-57335-A<br>Hours of Work and Overtime<br>Grievance |

Appearances:
  Carmell Charone Widmer Moss & Barr, by Mr. Martin P. Barr, on behalf of the Union.
  Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by Mr. Richard L. Samson and
  Ms. Jennifer L. Colvin, on behalf of the Company.

ARBITRATION AWARD

  The above-entitled parties, herein "Union" and "Company," are signatories to a collective

bargaining agreement, herein "agreement," providing for final and binding arbitration. Pursuant

thereto, a hearing was held in Chicago, Illinois, on January 26, April 7, and June 15, 2016. The

hearing was transcribed and the parties there agreed I would retain remedial jurisdiction if the

grievance is sustained. The parties subsequently filed Briefs and Reply Briefs which were

received by September 14, 2016.

  Based upon the entire record and the arguments of the parties, I issue the following

Award.

ISSUE

Since the parties were unable to jointly agree upon the issue, I have framed it as follows:

EXHIBIT A

Did the Company violate Article 2 of the agreement when it no longer allowed volunteers to work seven consecutive days in a calendar workweek without a 24-hour continuous rest period and, if so, what is the appropriate remedy?

## BACKGROUND

The Company's Chicago Bakery produces biscuits, cookies and crackers at its Chicago, Illinois, facility. There, about 86 unionized Machinists are represented by the Union. The electrical group and engineers are represented by the International Union of Operating Engineers, and the production employees are represented by the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union.

The Machinists maintain the mechanical operations which include the repair and preventive maintenance of equipment; line support when the machines are operating; teardown; and cleaning the equipment.

The workweek for the Machinists begins Sunday and ends Saturday during which time the Bakery operates three shifts, seven days per week. Their shifts are as follows:

| | |
|---|---|
| First | 6:45 a.m. to 2:45 p.m. |
| Second: | 2:45 p.m. to 10:45 p.m. |
| Third: | 10:45 p.m. to 6:45 a.m. |

These shifts have been utilized for at least twenty years.

Three Groups are scheduled to work five days during the calendar workweek as follows:

| | |
|---|---|
| Group One: | Starts Sunday (Machinists are assigned only to the third shift) |
| Group Two: | Starts Monday (Machinists are assigned to all 3 shifts) |
| Group Three: | Starts Tuesday (no Machinists are assigned) |

Prior to March 2, 2015, the Company allowed volunteer Machinists to work seven consecutive days in a calendar workweek without a continuous 24-hour rest break. If not enough volunteered, work was assigned to junior employees on a mandatory basis.

The then-Machinist Shop Chairs throughout that time were responsible for scheduling weekend overtime by posting sign-up sheets on Fridays and Mondays for volunteers between 5 - 8 days before the weekend work; by preparing a template of those overtime request on Mondays and sending it to planners in the bargaining unit and to Company representatives who determined the Company's upcoming weekend overtime needs; and by then finalizing the overtime lists on Wednesdays based upon seniority and posting the Overtime Manpower Listing on Wednesday afternoons.

The Company discontinued the prior practice of allowing volunteer Machinists to work seven consecutive days in a calendar workweek without having 24 consecutive hours of rest effective March 2, 2015.

Project Manager Howard Hartman testified that he decided to abrogate the practice because it violated the One Day Rest In Seven Act, 820 ILCS 140/1, et seq. infra., ("ODRISA").

The Company at that time also altered the process for assigning weekend overtime by creating a "LIS availability list" which limited overtime opportunities to those who had 24 hours of continuous rest during the Sunday through Saturday workweek and then sending it to the Shop Chair. Machinists who had no such rest thus were precluded from receiving said work.

Company Attorney Jennifer L. Colvin by letter dated May 1, 2015, asked Hugo Chaviano, the Director of the Illinois Department of Labor, for an advisory opinion on whether Company employees can work seven consecutive days in a calendar workweek without 24 hours

of continuous rest under the ODRISA, (Company Exhibit 3). Former Shop Chair Karl Sarpolis by letter dated July 16, 2015, also asked Mr. Chaviano for such an advisory opinion, (Company Exhibit 4). Mr. Chaviano did not respond to either letter.

Valarie Puccini, IDOL's General Counsel, on June 9, 2016, informed Attorney Colvin over the telephone that the IDOL did not issue advisory opinions and that it therefore would not respond to the Company's inquiry.

Mr. Sarpolis earlier filed a complaint with the IDOL wherein he claimed that the Company was not giving employees the proper rest period, and the IDOL dismissed it stating inter alia: "The law states the following: Employees must be given twenty-four consecutive hours of rest every calendar week," (Company Exhibit 8).

The Union filed a "Class Action Grievance" on March 16, 2015, (joint Exhibit 2), hence leading to this proceeding. [1]

<u>POSITIONS OF THE PARTIES</u>

The Union maintains that the Company has violated Article 2 of the agreement because "The Arbitrator's Role Is To Enforce The Plain Words Of The Agreement" which preclude "The Employer From Refusing To Allow Employees To Work Seven (7) Consecutive Days." The Union also argues that even if the agreement is ambiguous, a well-developed past practice supports its position. It further states that the Company's defense is preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (a); that I have no jurisdiction to interpret state law, and that the Company's defense has no merit because the ODRISA "allows employees

---

[1] The parties have agreed that all other pending, related grievances will be resolved based upon what is determined here.

to volunteer to work on their day of rest." The Union adds that the ODRISA's permit requirement affords the Company "no relief," and that the Company's compliance with the ODRISA "has been selective and arbitrary." As a remedy, the Union requests a cease and desist order, restoration of the parties' past practice; and a make-whole relief for all affected employees.

The Company states that it has not violated Article 2 because the Union has failed to meet its burden of proving any such violation and because the ODRISA prevails over the agreement or any past practice. It thus asserts that its current manner of scheduling seventh day work is consistent with the agreement and the ODRISA, and that any past practice relating to letting Mechanics work a seventh day without 24 consecutive hours rest was terminated in the negotiations for the current 2014 – 2017 agreement. It further states that preemption does not apply because the ODRISA "is a minimum labor standard" which is not preempted by Section 301.

<u>DISCUSSION</u>

The matter centers upon the interpretation and application of Article 2 which states in pertinent part:

. . .

**<u>Weekend and Holiday Overtime Scheduling</u>**

No more than 50% of the total headcount used for vacation calculations may be required to work on the sixth (6th) or seventh (7th) day.

No more than 25% of the total headcount used for vacation calculations may be required to work on Holidays.

All available volunteers will be assigned before requiring occurs. No employees will be required to work on a sixth (6th) or seventh (7th) day of the week preceding or the week of their vacation week.

5

In accordance with seniority, employees in the classification can be assigned either the four (4) hours immediately preceding, or immediately after their regular shift, but not both.

. . .

Both parties claim this language is clear and unambiguous and supports their respective positions.

The Union argues that this "plain language" precludes the Company from refusing to allow Machinists to work seven consecutive days in a calendar workweek because its focus "is to place limits" on the Company's ability to require them to work; because the Company "must first attempt to fill its overtime needs by utilizing volunteers"; and because the word "will" requires the assignment of such overtime to "All available volunteers."

The Company argues that the term "available" only refers to those Machinists who are able to work under the ODRISA – i.e., those who have been given a 24-hour continuous rest break during a seven consecutive day calendar workweek. The Company adds that if they do not have such a break, they are "unavailable" as that term is used in the agreement for the disputed overtime and that the Union "fully understood" that fact in negotiations.

I find that this disputed language is ambiguous on its face because it does not specifically address whether Machinists are eligible for such overtime if they do not have a 24-hour continuous break during their seven day calendar workweek, and because the word "available" can be construed to support either party's position.

It therefore is appropriate to consider parol evidence such as past practice and bargaining history.

As for past practice, former Shop Chair Sarpolis testified that "30 to 50 percent of the workforce would be working Saturdays and Sundays . . . every weekend" dating back to around 1985. He added that he personally worked seven consecutive days "probably 60, 70 percent" of the time. Former Shop Chair Wolf Rupp testified that since the mid 1980's about half of the bargaining unit worked seven consecutive days "Every weekend" for "at least 40" percent of the time.

Former Shop Chair John Kehoe, Jr., testified that he probably worked seven days a week about 50 percent of the time after he was hired in 2009. Current Shop Chair Matt Hagstrom testified that he and other Machinists worked seven consecutive days "most of the time" for the 17½ years he has been employed. He also said that the Company before March 2, 2015, never refused to allow them to work that overtime.

Maintenance head John Kennedy testified that before March 2, 2015, about 30 percent of the Machinists worked seven consecutive days in a calendar workweek for the four years he has been employed, and that no such voluntary requests to work that overtime ever were denied. Project Manager Hartman testified his investigation revealed that Machinists for about ten years worked seven consecutive days in a calendar workweek without a continuous 24-hour rest break.

This practice thus dated back to around 1985 and represented a binding past practice because it was unequivocal; clearly enunciated and acted upon; and readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both parties. See Elkouri and Elkouri, How Arbitration Works, (BNA, 7th Ed., 2012) at 12-4.

The Company claims that "whether employees were permitted to work seven consecutive days **without the required IDOL permits** is far from clear." Said permits allow each employee to work up to eight weeks a year without having to prove any business justification.

The Company, however, failed to produce any records showing that permits were always requested for all of the seven day work performed since the mid-1980's. Furthermore, even assuming _arguendo_ that such permits were requested, that shows there was a past practice to that effect and that the Company is no longer following it.

The longstanding past practice described above became part of the contract because, as stated in How Arbitration Works, _supra_, at 12-2, 3:

. . .

It is generally accepted that certain, but not all, clear and long standing practices can establish conditions of employment as binding as any written provision of the agreement.

In cases where the contract is completely silent with respect to a given activity, the presence of a well established practice, accepted or condoned by both parties, may constitute in effect, an unwritten principle on how a certain type of situation should be treated.

A union-management contract is far more than words on paper. It is also all the oral understandings, interpretations and mutually acceptable habits of action which have grown up around it over the course of time. Stable and peaceful relations between the parties depend upon the development of a mutually satisfactory superstructure of understanding which gives operating significance and practicality to the purely legal wording of the written contract. Peaceful relations depend, further, upon both parties faithfully living up to their mutual commitments as embodied not only in the actual contract itself but also in the modes of action which have become an integral part of it.

[I]t is well recognized that the contractual relationship between the parties normally consists of more than the written word. Day-to-day practices mutually accepted by the parties may attain the status of contractual rights and duties, particularly where they are not at variance with any written provision negotiated into the contract by the parties and where they are of long standing and were not changed during contract negotiations.

Custom can, under some unusual circumstances, form an implied term of a contract. Where the Company has always done a certain thing, and the matter is so well understood and taken for granted that it may be said that the Contract was

entered into upon the assumption that that customary action would continue to be taken, such customary action may be an implied term. (Footnote citations omitted).

. . .

Arbitrator Richard Mittenthal explained when such a binding past practice can be repudiated in the face of ambiguous contract language:

. . .

Consider next a well-established practice which serves to clarify some ambiguity in the agreement. Because the practice is essential to an understanding of the ambiguous provision, it becomes in effect a part of that provision. As such, it will be binding for the life of the agreement. And the mere repudiation of the practice by one side during the negotiation of a new agreement, unless accompanied by a revision of the ambiguous language, would not be significant. For the repudiation alone would not change the meaning of the ambiguous provision and hence would not detract from the effectiveness of the practice.

It is a well-settled principle that where past practice has established a meaning for language that is subsequently used in an agreement, the language will be presumed to have the meaning given it by practice. Thus, this kind of practice can only be terminated by mutual agreement, that is, by the parties rewriting the ambiguous provision to supersede the practice, by eliminating the provision entirely, etc.

. . .

*Past Practice And The Administration of Collective Bargaining Agreements,* Arbitration and Public Policy, Proceedings of the 14th Annual Meeting, National Academy of Arbitrators, (BNA Books, 1961), 30, 56. [2]

---

[2] Arbitrator Mittenthal added that a different principle applies when a past practice flies in the face of contrary contract language, as the party wanting to maintain the past practice has the affirmative duty to obtain contract language to that effect when the other party repudiates it during negotiations. Id. at 56. That principle does not apply here because the agreement is ambiguous.

The parties' prior contract did not expressly address whether employees could work seven consecutive days in a calendar workweek without a 24-hour continuous break in either Article 2 or any other part of the contract. That contract therefore was ambiguous on this issue.

As a result, it was incumbent upon the Company in the 2014 contract negotiations leading up to the current agreement to obtain, in Arbitrator Mittenthal's words, "a revision of the ambiguous language" which reflected the parties' "mutual agreement" to terminate the practice and rewrite "the ambiguous provision to supersede the practice . . ."

Those negotiations show that the parties had a missing of the minds over what they agreed to regarding working seven consecutive days in a calendar workweek without 24 hours of continuous rest.

The Company's initial May 14, 2014, contract proposal included the following language: "All employees must have twenty-four (24) consecutive hours of rest every calendar workweek in accordance with Illinois law." The Company resubmitted that language on May 29 and July 15, 2014, and the Union rejected all of those proposals. The Company's final July 16, 2014, proposal deleted that language.

The Union's May 14 and May 29, 2014, proposals included the following language: "All available volunteers will be assigned before requiring occurs." The Company accepted that language on May 29, 2014, and continued to do so in its subsequent proposals.

The Union on May 29, 2014, also proposed the following language: "Available workforce is the total workforce less employees on scheduled vacation or going on scheduled vacation," which the Company rejected.

The Company on three occasions thus proposed contract language which would have prevented employees from working seven consecutive days during a calendar workweek "in accordance with Illinois law," and the parties ultimately agreed to revise Article 2 which now states: "All available volunteers will be assigned before requiring occurs."

Mr. Sarpolis and Mr. Rupp testified that they explained to Company negotiators that this language meant that any employees who were physically present and "signed up on the sign-up sheet during the workweek would be allowed to work before the Company could force somebody for weekend overtime." But, they acknowledged that the Company did not agree to their interpretation and that the Company consistently asserted the word "available" referred to employees who were permitted to work under the ODRISA. Mr. Kehoe corroborated Mr. Sarpolis and Mr. Rupp's testimony by stating: "They said that all available meant people that are pretty much physically there, just like it says in the previous sentence." He added: "The Company objected, from what I can remember."

Director of Labor Relations Pamela DiStefano testified that the Company understood that the word "available":

> . . . meant that people had to be available, meaning legally available and available in other – in any other way to work. So they weren't available if they hadn't had their 24-hour rest period.

She also said that the Company maintained this position throughout the negotiations and told the Union that the Union's proposal would violate the ODRISA. She also said that the Union never explained what the term "All available volunteers" meant, and that the Union never stated that term referred to the past practice regarding weekend overtime scheduling.

11

While both parties' bargaining understandings are reasonable, the record fails to show that either party over the bargaining table ever told the other party words to the effect: "Yes, we agree to your interpretation and that will be the way the term 'available' will be construed under the new agreement."

The record also fails to explain why the Union would have agreed to the Company's interpretation after the Union had rejected the Company's three earlier proposals which sought to limit weekend overtime work "in accordance with Illinois law." Conversely, there is no explanation why the Company would have agreed to the past practice given its belief that it was not "in accordance with Illinois law."

I therefore find that there was no mutual agreement between the parties to alter the longstanding past practice and that it continued in the current agreement for reasons set forth above by Arbitrator Mittenthal.

The Company claims that its current manner of scheduling a seventh day work is consistent with the agreement and the ODRISA. It thus cites the example of Group 2 Machinist William Prosser who normally works a Monday through Friday workweek on the first shift, and who after March 2, 2015, was able to work on either the second or third shift on Sunday because he had received 24 hours of consecutive rest. The Company states "This generally results in employees picking up overtime shifts that are off their regular week day shift."

But there is a big difference between working a normal first shift as most Machinists do versus working a second or third shift which can disrupt one's sleep cycle and regular daily activities. Mr. Hagstrom thus testified that if he had to work a second shift, "I would be very tired. If I had to work third shift, I couldn't even function the next day."

12

The Company's current manner of scheduling such work thus constitutes a material change in the longstanding past practice.

I further find that the agreement does not refer to or incorporate by reference the ODRISA, and that the agreement on its face does not require that it be considered in an arbitration proceeding. That, then, raises the question of whether such external law should be considered here and, if so, what effect it should be given.

The Union argues that the ODRISA does not apply to the Machinists because it states:

. . .

Sec. 2. Every employer shall allow every employee except those specified in this Section at least twenty-four consecutive hours of rest in every calendar week in addition to the regular period of rest allowed at the close of each working day.

. . .

This Section does not apply to the following:
(1) Part-time employees whose total work hours for one employer during a calendar week do not exceed 20; and
(2) Employees needed in case of breakdown of machinery or equipment or other emergency requiring the immediate services of experienced and competent labor to prevent injury to person, damage to property, or suspension of necessary operation;

. . .

But here, Mr. Hartman testified that the weekend work primarily is focused on tear-down and reassembly to support the cleaning of lines, along with providing preventative maintenance. Machinists thus are mainly called in to perform their **regular** job duties as opposed to working on the "breakdown of machinery or equipment or other immediate emergency" requiring their "immediate services."

13

That is why Machinists sign up for weekend work to perform those **regular** job duties 5 – 8 days before they actually report to work on Saturdays and Sundays. Moreover, even if some breakdown of machinery or equipment or other emergency work is performed, there is no basis for finding that **all** Machinists perform such work and that they **all** are exempt from the ODRISA's coverage.

The Company maintains that the ODRISA "prevails over the collective bargaining agreement or any past practice" because it "promotes public health and safety that is traditionally occupied by the States." It argues that arbitral case law supports its position, citing, inter alia, Jewel Food Stores, Inc. and Teamsters Local 710, 2009 WL 9419862 (Kossoff, March 18, 2009). It also contends that the ODRISA "is a minimum labor standard and is not preempted by Section 301 of the Labor Management Relations Act, citing Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724 (1985); Fort Halifax Packing v. Coyne, 482 U.S. 1 (1987); and South Michigan Ave. Associates, Ltd. V. Shannon, 549 F.3d 1119 (7th Cir., 2008).

The Union asserts that "The Arbitrator has 'No Jurisdiction to Interpret State Law'" and that "The Employer's defense is preempted by Section 301, citing 520 South Michigan Ave., supra, for the proposition that there are different types of preemption doctrines – e.g., those involving Section 301 and those involving the National Labor Relations Act, ("NLRA"). It also states that Jewel is distinguishable and that the other federal cases cited by the Company are inapposite because they centered on preemption under the NLRA and not Section 301.

Arbitrator Kossoff ruled in Jewel that the employer did not violate the contract when it refused to let employees work seven consecutive days in a calendar workweek without 24 hours of continuous rest for about 10 years because it was required to follow the ODRISA. In so

ruling, he noted: "Not a word was said about the Illinois Act in the 2007 negotiations," and that the union had no "sense of assurance" that the contract it had bargained included a provision which would violate the ODRISA. Id. at 14.

That situation is distinguishable because the parties in the 2014 contract negotiations repeatedly addressed the ODRISA and because the longstanding past practice of allowing such seven-day work was incorporated into the current agreement.

Arbitrator Kossoff also stated that the ODRISA "had already become an implied term" of the contract because of the 10-year or so past practice to that effect. Id. at 15. Here, the contrary past practice dating back to the mid-1980's established a term of the contract which provided for such weekend work.

The Union cites Atchley v. Heritage Cable Vision Associates, 101 F.3d. 495 (1996), where the Seventh Circuit ruled that a wage claim based upon a collective bargaining agreement was preempted by Section 301 because it required the interpretation of the contract. It also cites National Metalcrafts v. McNeil, 784 F.2d. 817 (1986) where the Seventh Circuit ruled that a vacation benefits claim arising under a collective bargaining agreement was preempted by Section 301.

The Company asserts that these cases are distinguishable because "in each case there was no state law that mandated an action, so the Courts had to look to the collective bargaining agreement," unlike here where the ODRISA mandates certain action.

But in Atchley, supra, there was a state law relating to the late payment of wages and the Court stated:

. . .

> Instead, as we have noted, preemption is found when a provision of the collective bargaining agreement is the subject of the dispute or the dispute is substantially dependent upon an analysis of the terms of the collective bargaining agreement. *Loewen*, 65 F.3d at 1423.

. . .

Here, the agreement is the "subject of the dispute" and the dispute is "substantively dependent" upon an analysis of Article 2 and the 2014 contract negotiations which led to the disputed term "All available volunteers." This dispute also is "substantially dependent" upon the longstanding past practice which has been incorporated into the agreement.

National Metalcrafts, supra, also involved a state law claim relating to paying vacation benefits. The Court ruled that "Illinois' wage payment act to this dispute over vacation pay is doubly preempted: by Section 301 of the Taft Hartley Act and Section 8 of the National Labor Relations Act." Id., at (21) (22).

But even assuming arguendo that state law should apply, it is unclear whether state law, as administered by the IDOL, prohibits the performance of the disputed work.

The ODRISA states:

> Every employer shall allow every employee except those specified in this Section at least twenty-four consecutive hours of rest in every calendar week in addition to the regular period of rest allowed at the close of each working day.

> 820 ILCS 140/2; Co. Ex. 1.

. . .

> The Director of Labor shall grant permits authorizing the employment of persons on days of rest designated pursuant to Section 4 of this Act. Such permits shall not authorize the employment of persons for 7 days a week for more than 8 weeks in any one year, unless the Director finds that the necessity for employment of

16

persons on their designated day of rest cannot be remedied by increasing the
number of employees or by adjusting production schedules.  The Director of
Labor shall give due consideration to business necessity and economic viability in
granting such permits.

820 ILCS 140/8; Co. Ex. 1.

. . .

Neither party has cited any case law interpreting the state law issue presented in this case.

However, former IDOL General Counsel Attorney Ronald Willis issued an advisory

opinion on November 18, 2013, in response to an inquiry from the City of Pekin and its police

union which asked whether police officers could volunteer to work seven consecutive days in a

calendar workweek without 24 hours of continuous rest, (Union Exhibit 11 at 4).

The City of Pekin and the union earlier had agreed to a side letter to their collective

bargaining agreement which stated in pertinent part:

. . .

THE PARTIES AGREE AS FOLLOWS:

1.  Employees covered by the CBA may voluntarily work seven
    consecutive days, including voluntary overtime, but may not be
    required to work seven consecutive days by the City of Pekin; and

2.  Employees who voluntarily work seven consecutive days waive
    and relinquish all claims and rights against the City of Pekin under
    Section 2 of the Illinois "One Day Rest in Seven Act."
    820 ILCS 140/2; and

3.  Employees voluntarily working seven consecutive days under this
    agreement shall not constitute a violation of Section 2 of the
    Illinois "One Day Rest in Seven Act."  820 ILCS 140/2; and

. . .

17

Attorney Willis' November 18, 2013, response letter to the parties stated:

. . .

Gentlemen:

Te (sic) side letter you proposed and the conditions set forth therein would not in the Department's Opinion violate the One Day Rest in Seven Act, 820 ILCS 140/2 and work under such an agreement would not violate such Act.

. . .

Attorney Willis explained that the Department approved the side letter because it was voluntary; because there was union oversight to ensure that said work was voluntary; and because there was a business necessity for employees to voluntarily work seven consecutive days in a calendar workweek, adding that then-IDOL Director Joseph Castigan approved his letter. He also said "Employers just don't agree to things unless there's some business necessity"; that "the statue's primary purpose is to make sure it's voluntary"; and that the new political administration may possibly have a different view from the one he expressed in his letter.

Acknowledging that he did not know the IDOL's current policies, he further stated that the IDOL for "years and years and years" did not send out written confirmations that a requester's permit request had been granted in spite of IDOL regulations calling for such confirmation. He also said that requests were always granted without any investigation, and that the requester was free to proceed with the assumption that IDOL had approved the request.

There is no such side letter here. But there is a binding past practice dating back to the mid-1980's which has been incorporated into the parties' agreement. The mutuality expressed in the Pekin side letter therefore is akin to the mutuality expressed in the past practice.

The Company argues that the Union's reliance upon the letter is misplaced because it was not provided to the Company until the instant hearing; because it is not published and hence is not binding on the current IDOL administration; and because the Pekin agreement "acted as a substitute for a permit itself."

There was no requirement to furnish the letter to the Company before the hearing. Furthermore, while the letter is not binding on the new administration, it nevertheless shows how the IDOL administered the ODRISA when Attorney Willis served as General Counsel. And, there is no reason why the parties here also cannot agree to a process which also is a substitute for a permit.

Attorney Willis' November 18, 2013, letter, which was approved by then-IDOL head Castigan, therefore establishes that the IDOL then took the official position that employees could work seven consecutive days in a calendar workweek without 24 hours of continuous rest.

While the letter may have no precedential value, it nevertheless shows that state law is unclear regarding how the ODRISA is being administered.

As a result, I find that such uncertain state law does not supersede the agreement and the past practice which permits the assignment of said work.

The Company also claims that Attorney Willis' letter rested upon the "key factor" that a business necessity for the overtime work existed, unlike here where the Company "did not and does not agree that the business need cannot be remedied by adjusting the schedules."

The Company, however, since the mid-1980's has agreed to a binding past practice which recognized that the disputed weekend work had to be performed because it was a business necessity that could not be fixed through different scheduling.

Given that nearly 30-year history, I find that the Company has not proven that changed circumstances have created a different business necessity which warrants abolishing that practice.

The Company also argues "an arbitrator cannot direct the parties to violate the law . . ."

That is true. But an arbitrator under the agreement can direct a party to follow a binding past practice dating back to the mid-1980's which has been incorporated into the agreement when the IDOL has recognized that parties to a collective bargaining agreement can agree that employees can voluntarily perform such work, thereby creating uncertainty over how the ODRISA is being administered and what the current state of the law is.

The Company also points out that penalties under the ODRISA "are stiff" for each violation ranging from $25 - $100; that "the parties cannot waive any employee's individual rights under the ODRISA"; and that the Company "would always be subject to the IDOL concluding that the Company violated the ODRISA."

Since Machinists are voluntarily agreeing to work the disputed weekend work, it would appear that they are waiving their right to complain about it.

Nevertheless, and out of excessive caution, any Machinist wanting to work such overtime in the future must sign the kind of waiver contained in the Pekin side letter which, as modified, states the following:

1.    Machinists covered by the collective bargaining agreement between the International Association of Machinists and Aerospace Workers, AFL-CIO, District 8, and Mondelez Global, LLC, ("Company"), may voluntarily work seven consecutive days, including voluntary overtime, but may not be required to work seven consecutive days by the Company.

2.   Machinists who voluntarily work seven consecutive days waive and relinquish all claims and rights against the Company under Section 2 of the Illinois "One Day Rest in Seven Act." 820 ILCS 140/2; and [3]

_____

Signed And Dated

. . .

Based upon all of the above, I conclude that the Company violated Article 2 of the agreement when it no longer allowed volunteers to work seven consecutive days in a calendar workweek without 24 hours of continuous rest.

Turning now to the question of remedy, the Union requests a cease and desist order; restoration of the past practice which existed before March 2, 2015; and a make-whole order for all affected employees.

This requested remedy shall be granted to rectify the Company's violation of Article 2.

The Company thus immediately shall cease and desist from disqualifying volunteer Machinists from working Saturdays and Sundays in a seven consecutive day calendar workweek even if they do not have 24 hours of continuous rest, and it immediately shall restore the prior past practice described above.

The Company also immediately shall make whole all affected employees by paying them what they would have earned (including benefits) if they were able to work and had been allowed to work seven consecutive days in a calendar workweek without 24 hours continuous

_____

[3]   The parties can mutually modify said form.

21

rest from March 2, 2015, to the present. Their overtime shall be calculated by determining the average of such monthly weekend overtime they worked during the six months before March 2, 2015, and then paying them that amount of overtime if it was available after March 2, 2015.

Each Machinist therefore is entitled to that monthly overtime from March 2, 2015, to the present unless they during that time period experienced extended absences such as Family and Medical Leave, Workers' Compensation and other extended leaves of absences which prevented them from working, in which case they are not entitled to back pay for the times of said absences.

This remedy is aimed at restoring the status quo ante and to make whole all affected Machinists for the overtime they otherwise would have received and not granting a windfall to those who did not volunteer for such prior weekend overtime. Accordingly, no back pay or benefits will be paid to Machinists who did not volunteer during the six-month period prior to March 2, 2015. If there are any individual circumstances which warrant additional non-payment or payment, I shall consider them.

Based upon the above, I issue the following

## AWARD

1.    The Company violated Article 2 of the agreement when it no longer allowed volunteer Machinists to work seven consecutive days in a calendar workweek without 24 hours of continuous rest.

2.    The Company immediately shall cease and desist from disqualifying volunteer Machinists from working seven consecutive days in a calendar workweek even if they do not have 24 hours of continuous rest.

3.   The Company immediately shall make whole all affected Machinists in the manner described above.

4.   In order to resolve any questions arising over the application or interpretation of the remedy, I shall retain remedial jurisdiction for at least sixty days and I shall automatically extend it if necessary.

Dated: November 23, 2016

                                        Amedeo Greco  /s/
                                        _____
                                        Amedeo Greco, Arbitrator